1
2
3
4
5
6
7

**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
SKYE RESENDES (SBN 278511)
*skye@consumersadvocates.com*
3636 4th Avenue, Suite 202
San Diego, California 92103
Telephone:   (619) 696-9006
Facsimile:   (619) 564-6665

*Attorneys for Plaintiff and the Proposed Class*

8
9

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11

| | |
|---|---|
| MELISSA NIGH, on behalf of herself, all others similarly situated and the general public, | Case No.: **'12CV2714 MMADHB**<br>Filed: |

12

| | |
|---|---|
| Plaintiff,<br> vs. | CLASS ACTION |

13
14

HUMPHREYS PHARMACAL, INCORPORATED, a Delaware Corporation, DICKINSON BRANDS, INC., a Delaware Corporation,

**COMPLAINT FOR:**

1. **VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT [CIV. CODE §§ 1750, *et seq.*]**

15
16

Defendants.

2. **VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW [BUS. & PROF. CODE §§ 17200, *et seq.*]**

17
18
19

3. **VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW [BUS & PROF. CODE §§ 17500, *et seq.*]**

20

4. **BREACH OF EXPRESS WARRANTY**

21
22

5. **BREACH OF IMPLIED WARARANTY OF MERCHANTABILITY**

23
24

6. **VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT [15 U.S.C. §§ 2301, *et seq.*]**

25

7. **UNJUST ENRICHMENT**

26

DEMAND FOR JURY TRIAL

27
28

1

Plaintiff Melissa Nigh, on behalf of herself, all others similarly situated, and the general public ("Plaintiff"), allege against defendant Humphrey's Pharmacal, Incorporated, ("Humphreys") and its parent company Dickinson Brands, Inc. ("Defendants").  Plaintiff alleges the following upon her own knowledge, or where there is no personal knowledge, upon information and belief and the investigation of her counsel:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005, because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000.00 and is a class action where Plaintiff, a member of the class, is from a different state than Defendants.  On information and belief, more than two-thirds of the members of the class are citizens of a state different from the Defendants.  This Court also has original jurisdiction over the federal claim under the Magnuson-Moss Warranty Act pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2.      Personal jurisdiction derived from the fact that the Defendants conduct business within the State of California and within this judicial district.

3.      Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(2) because many of the acts and transactions, including the purchases and sales giving rise to this action, occurred in this district and because Defendants:

      (i)      are authorized to conduct business in this district and have intentionally availed themselves of the laws and markets within this district through the promotion, marketing, distribution and sale of its products in this district;

      (ii)     do substantial business in this district;

      (iii)    advertise to consumers residing in this district; and,

      (iv)     are subject to personal jurisdiction in this district.

/ / /

2

**THE PARTIES**

4.      Plaintiff Melissa Nigh is a resident of Morgan Hill, California.

5.      Defendant Humphrey's Pharmacal, Incorporated is a Delaware corporation that maintains its principal place of business, corporate headquarters, and residence in Connecticut.

6.      Defendant Dickinson Brands, Inc. is a Delaware corporation that maintains its principal place of business in Connecticut.

7.      Defendants are the manufacturer and seller of homeopathic products that are nothing more than placebos, as set forth herein.   This complaint concerns Defendants' homeopathic products known as Original Teething Pellets #3, Cherry Teething Pellets #3, Berry Teething Pellets #3, Simple Fever #1, Simple Diarrhea #4, Bedwetting Pellets #30, Cherry Colic Pellets #36, Cough Control #7, Cold Relief #77, Symptoms of Delayed Menses, Arthritis Relief #15, Insomnia Relief #40, and Simple Nervous Conditions #28, and all iterations/variations of the aforementioned products (collectively, the "Products").   This complaint also encompasses all known homeopathic products made by Defendants.   Defendants produce, market, and sell homeopathic products, throughout the United States.

**BACKGROUND**

8.      Homeopathic medicine has been practiced in United States since the early 19th century.   Homeopathy seeks to stimulate the body's ability to heal itself by giving very small doses of highly diluted substances.   However, there is little evidence that homeopathy is effective, much less that people understand homeopathic principles.[1]

9.      Homeopathy is premised on two main principles; the principle of similars and the principle of dilutions.   Under the "principle of similars" a disease can be cured by a substance

---

[1] *See* http://nccam.nih.gov/sites/nccam.nih.gov/files/homeopathy.pdf, last visited on July 6, 2012.

3

1
2
that produces similar symptoms in healthy people.  Under the "principle of dilutions" the *lower* the dose of the medication, the *greater* its effectiveness.[2]

3
4
5
6
7
8
10.     However, it is paradoxical that through dilution an ingredient would reach higher potency.  Further, in highly diluted remedies, there is a very low probability that even a single molecule of the original substance is present in the Product.  For example, a level of 12C dilution is the equivalent to a pinch of salt in both the North and South Atlantic Oceans.[3]  Allegedly, the more diluted the ingredient, the more effective it becomes.

9
10
11
12
13
14
11.     Homeopathic remedies are not marketed and sold in the United States in the same manner as when they first originated, approximately 200 years ago.  When homeopathic drugs first originated, people would typically consult with a licensed homeopathic practitioner, who would compound his or her own homeopathic remedy, or provide a prescription to the patient.  Food and Drug Administration Compliance Policy Guide ("CPG") § 400.400.

15
16
17
18
12.     Historically, homeopathic drugs were also not labeled and there was no direct-to-consumer advertising.  Instead, homeopathic remedies were primarily marketed to licensed homeopathic practitioners.  "CPG" § 400.400.

19
**FACTS**

20
21
13.     Defendants manufacture, advertise, distribute and sell their homeopathic Humphreys Products[4] throughout the United States.

22
23
24
14.     Defendants manufacture, advertise, distribute and sell three main categories of homeopathic products: Children's Remedies, Cold & Flu Remedies and Pain Relief Remedies.

25
[2] *See* http://nccam.nih.gov/sites/nccam.nih.gov/files/homeopathy.pdf, last visited on July 6, 2012.

26
[3]     *See*     http://www.healthguidance.org/entry/12178/1/An-Introduction-to-Homeopathic-Remedies.html, last visited on July 6, 2012.

27
28
[4] **Exhibit 1** to this Complaint has a more through description of the Products, including pictures.

4

15.     During the class period defined herein, Plaintiff Nigh purchased Defendants Product(s) from in Morgan Hill, California.  Plaintiff Nigh is a consumer as described herein.

16.     In purchasing Defendants Product(s), Plaintiff Nigh relied upon various representations Defendants made on the Products' labels, such as the Products' name itself, that it would relieve symptoms associated with its name, would be a "100% All Natural," "Fast Acting" remedy, among other representations.

17.     Defendants Product(s) did not work for Plaintiff Nigh as advertised.

**CHILDREN'S REMEDIES**

18.     Defendants manufacture, advertise, distribute and sell a variety of Children's Remedies, including, Teething Relief (Original Teething Pellets #3, Cherry Teething Pellets #3, Berry Teething Pellets #3),[5] Simple Fever #1, Simple Diarrhea #4, Bedwetting Pellets #30, and Cherry Colic Pellets #36.

19.     Defendants advertise their Children's Remedies as "100% All Natural," "Fast Acting," and "Gentle" relief of various symptoms including teething, fevers, diarrhea, bedwetting and colic.

A.     Baby Teething Relief (Very Cherry and Original Flavors)

20.     Defendants advertise that Baby Teething Relief "relieves pain & inflammation," "calms restlessness and irritability," "temporarily relieves minor irritation, pain and wakefulness associated with teething in infants."  It purports to provide "multi-symptom relief of irritation, irritability, restlessness and inflammation of the gums."  *See* Exs. 1-2.

---

[5] Defendants also produce and market or have produced and marketed other varieties of Teething Relief, including, Teething Relief – Very Cherry and Original; Teething Relief Belladonna Free – Very Cherry and Original; Baby Teething Relief Cherry Swift Strips, Teething Relief Cherry Swift Strips, Teething Relief Pellets -Very Cherry & Original, Teething Pellets #3- Very Cherry & Original.  This complaint includes all varieties of Defendants Teething Relief Products.

21.     In purchasing Baby Teething Relief, consumers rely upon various representations Defendants make on the Products' packaging label, such as the name itself, that it is "Fast Acting," "100% Natural," and provides "Teething Relief," among other representations.  *See* Misrepresentation Chart, attached hereto as Ex. 2 for the challenged statements regarding the Product.

22.     The purportedly active ingredients of Baby Teething Relief include *Chamomilla* (3X HPUS), *Coffea Cruda* (3X HPUS), *Belladonna* (3X HPUS) and *Calcarea Phosphorica* (12X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves the symptoms of teething are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Dilution Chart, attached hereto as Ex. 3.

23.     The ingredients used in Baby Teething Relief provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

24.     Defendants know there are **no** or just **trace** amounts of active ingredients present in Baby Teething Relief and therefore must be aware that  Baby Teething Relief cannot relieve any symptoms for which the Defendants advertise them.

25.     Baby Teething Relief is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Baby Teething Relief is sold in 135 ct. boxes and the price is approximately $6.99 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices

1   have enriched them by hundreds of thousands of dollars, at the expense of thousands of

2   Americans.

3       26.     Absent the misstatements described herein, consumers would not have purchased

4   Baby Teething Relief.

5       27.     Plaintiff seeks justice for herself and similarly-situated consumers of Baby

6   Teething Relief by means of this action to enjoin the ongoing deceptive practices described

7   herein.

8

9           B.   Baby Teething Relief – Belladonna Free (Very Cherry and Original Flavors)

10      28.     Defendants advertise that Baby Teething Relief – Belladonna Free "Relieves Pain

11  & Inflammation," "Calms restlessness and irritability," and "temporarily relieves minor

12  irritation, pain and wakefulness associated with teething in infants."  It purports to "Relieve[]

13  irritation pain of swollen gums," "Calms restlessness and irritability, and "Supports dentition."

14  *See* Exs. 1-2.

15      29.      In purchasing Baby Teething Relief – Belladonna Free, consumers rely upon

16  various representations Defendants make on the Product's packaging label, such as the Product's

17  name itself, that it is "Fast Acting," "100% Natural," and provides "Teething Relief," among

18  other representations.  *See* Ex. 2, Misrepresentation Chart.

19      30.     The purportedly active ingredients of Baby Teething Relief - Belladonna Free

20  include *Chamomilla* (3X HPUS), *Coffea Cruda* (3X HPUS) and *Calcarea Phosphorica* (12X

21  HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly

22  diluted as to be effectively non-existent in the Product such that the Product is ineffective for its

23  intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves the

7

symptoms of teething are unwittingly spending hundreds of thousands of dollars each year on worthless products. *See* Ex. 3, Dilution Chart.

31.     The ingredients used in Baby Teething Relief – Belladonna Free provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

32.     Defendants know there are **no** or just **trace** amounts of active ingredients present in Baby Teething Relief – Belladonna Free and therefore must be aware that Baby Teething Relief – Belladonna Free cannot relieve any symptoms for which the Defendants advertise them.

33.     Baby Teething Relief – Belladonna Free is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Baby Teething Relief is sold in 135 ct. boxes and the price is approximately $6.99 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

34.     Absent the misstatements described herein, consumers would not have purchased Humphrey's Baby Teething Relief – Belladonna Free.

35.     Plaintiff seeks justice for herself and similarly-situated consumers of Baby Teething Relief – Belladonna Free by means of this action to enjoin the ongoing deceptive practices described herein.

        C.   Baby Teething Relief (Cherry Swift Strips)

36.     Defendants advertise that Baby Teething Relief Cherry Swift Strips "Relieve[] irritation of swollen gums," "calm[] restlessness and irritability," and "temporarily relieve[]

8

minor irritation, pain and wakefulness associated with teething in infants."  It purports to be a "Triple- Action Teething Remedy" which is "100% All Natural."  *See* Exs. 1-2.

37.    In purchasing Baby Teething Relief Cherry Swift Strips, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is "Fast acting," "100% All Natural," and provides "Teething Relief," among other representations.  *See* Ex. 2, Misrepresentation Chart.

38.    The purportedly active ingredients of Baby Teething Relief Cherry Swift Strips include *Chamomilla* (3X HPUS), *Coffea Cruda* (3X HPUS), *Belladonna* (3X HPUS), and *Calcarea Phosphorica* (12X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves the symptoms of teething are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

39.     Moreover, the inactive ingredients in Baby Teething Relief Cherry Swift Strips include Polysorbate 80, which is a product of the chemical reaction of Sorbitan and Oleic Acid. Polysorbate 80 is **not** a natural ingredient, although Defendants advertise Baby Teething Relief Cherry Swift Strips as "100% All Natural."

40.    The ingredients used in Baby Teething Relief Cherry Swift Strips provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

41.     Defendants know there are **no** or just **trace** amounts of active ingredients present in Baby Teething Relief Cherry Swift Strips and therefore must be aware that Baby Teething Relief Cherry Swift Strips cannot relieve any symptoms for which the Defendants advertises them.

42.     Baby Teething Relief Cherry Swift Strips are nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Humphrey's Baby Teething Relief Cherry Swift Strips are sold in 18 ct. boxes and the price is approximately $6.99 per 18-strip package. Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

43.     Absent the misstatements described herein consumers would not have purchased Baby Teething Relief Cherry Swift Strips.

44.     Plaintiff seeks justice for herself and similarly-situated consumers of Baby Teething Relief by means of this action to enjoin the ongoing deceptive practices described herein.

D.   Baby Teething Relief (Cherry Swift Strips – Belladonna Free)

45.     Defendants advertise that Baby Teething Relief Cherry Swift Strips – Belladonna Free "Relieve[] pain of swollen gums," "Calm[] restlessness and irritability," and "temporarily relieve[] minor irritation, pain and wakefulness associated with teething in infants."  It purports to be a "Triple- Action Teething Remedy" which is "100% All Natural."  *See* Exs. 1-2.

46.     In purchasing Baby Teething Relief Cherry Swift Strips – Belladonna Free, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is "Fast Acting," "100% All Natural," and provides "Teething Relief," among other representations.  *See* Ex. 2, Misrepresentation Chart.

10

47.     The purportedly active ingredients of Baby Teething Relief Cherry Swift Strips –
Belladonna Free include *Chamomilla* (3X HPUS), *Coffea Cruda* (3X HPUS), and *Calcarea
Phosphorica* (12X HPUS).  However, the active ingredients, even if they were otherwise
effective, are so greatly diluted as to be effectively non-existent in the Product such that the
Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that
the Product relieves the symptoms of teething are unwittingly spending hundreds of thousands of
dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

48.      Moreover, the inactive ingredients in Baby Teething Relief Cherry Swift Strips –
Belladonna Free include Polysorbate 80, which is a product of the chemical reaction of Sorbitan
and Oleic Acid.  Polysorbate 80 is **not** a natural ingredient, although Defendants advertise Baby
Teething Relief Cherry Swift Strips – Belladonna Free as "100% All Natural."

49.     The ingredients used in Baby Teething Relief Cherry Swift Strips – Belladonna
Free provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the
product, they can have no effect of any kind in humans because the odds are astronomically high
that even a single molecule derived from the original "extract" of the "active ingredients" could
be present in the Product sold to consumers.

50.     Defendants know there are **no** or just **trace** amounts of active ingredients present
in Baby Teething Relief Cherry Swift Strips – Belladonna Free and therefore must be aware that
Baby Teething Relief Cherry Swift Strips – Belladonna Free cannot relieve any symptoms for
which the Defendants advertises them.

51.     Baby Teething Relief Cherry Swift Strips – Belladonna Free are nothing more
than a placebo, with zero or a trace of the claimed active ingredients.  Baby Teething Relief
Cherry Swift Strips – Belladonna Free are sold in 18 ct. boxes and the price is approximately

*Nigh v. Humphreys Pharmacal, Inc., et al.*
CLASS ACTION COMPLAINT

$6.99 per 18-strip package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

52.     Absent the misstatements described herein consumers would not have purchased Baby Teething Relief Cherry Swift Strips – Belladonna Free.

53.     Plaintiff seeks justice for herself and similarly-situated consumers of Baby Teething Relief Cherry Swift Strips – Belladonna Free by means of this action to enjoin the ongoing deceptive practices described herein.

E.   Teething Pellets #3 (Very Cherry and Original Flavors)

54.     Defendants advertise that Teething Pellets #3 "gently soothe discomfort," and "temporarily relieve[] minor irritation, pain and wakefulness associated with teething in infants." It purports to provide "safe effective relief for children."  *See* Exs. 1-2.

55.      In purchasing Teething Relief Pellets #3, consumers rely upon various representations Defendants make on the Product's label, such as the Product's name itself, that it is "Fast Acting," "100% All Natural," and provides "relie[f] for minor irritation" among other representations.  *See* Ex. 2, Misrepresentation Chart.

56.     The purportedly active ingredients of Teething Pellets #3 include *Chamomilla* (3X HPUS), *Coffea Cruda* (3X HPUS), *Belladonna* (3X HPUS) and *Calcarea Phosphorica* (12X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves the symptoms of teething are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

12

57.     The ingredients used in Teething Pellets #3 provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

58.     Defendants know there are **no** or just **trace** amounts of active ingredients present in Teething Pellets #3 and therefore must be aware that Teething Pellets #3 cannot relieve any symptoms for which the Defendants advertise them.

59.     Teething Pellets #3 are nothing more than a placebo, with zero or a trace of the claimed active ingredients. Teething Pellets #3 are sold in 135 ct. boxes and the price is approximately $8.49 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

60.     Absent the misstatements described herein, consumers would not have purchased Teething Pellets #3.

61.     Plaintiff seeks justice for herself and similarly-situated consumers of Teething Pellets #3 by means of this action to enjoin the ongoing deceptive practices described herein.

F.    Simple Fever #1[6]

62.     Defendants advertise that Simple Fever #1 "temporarily reduces fever."  It purports to provide a "Gentle Formula" with "natural ingredients that work gently to help your body return to a natural state of health."  *See* Exs. 1-2.

---

[6] Defendants also advertise Simple Fever #1 as a Cold & Flu Remedy.

63.      In purchasing Simple Fever #1, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is a "safe, all natural fever reducer," among other representations.  *See* Ex. 2, Misrepresentation Chart.

64.      The purportedly active ingredients of Simple Fever #1 include *Aconitum napellus* (3X HPUS), *Veratrum viride* (2X HPUS), *Bryonia alba* (3X HPUS), and *Belladonna* (3X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

65.      The ingredients used in Simple Fever #1 provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

66.      Defendants know there are **no** or just **trace** amounts of active ingredients present in Simple Fever #1 and therefore must be aware that Simple Fever #1 cannot relieve any symptoms for which the Defendants advertise them.

67.      Simple Fever #1 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Simple Fever #1 is sold in 135 ct. boxes and the price is approximately $6.99 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

68.     Absent the misstatements described herein, consumers would not have purchased Simple Fever #1.

69.     Plaintiff seeks justice for herself and similarly-situated consumers of Simple Fever #1 by means of this action to enjoin the ongoing deceptive practices described herein.

G.   <u>Simple Diarrhea #4</u>[7]

70.     Defendants advertise that Simple Diarrhea #4 "temporarily controls and relieves symptoms of diarrhea."  It purports to provide a "Gentle Formula" with "natural ingredients that work with your body to provide gentle relief."  *See* Exs. 1-2.

71.     In purchasing Simple Diarrhea #4, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is "Fast Acting" and an "All Natural Anti-Diarrheal Remedy," among other representations.  *See* Ex. 2, Misrepresentation Chart.

72.     The purportedly active ingredients of Simple Diarrhea #4 include *Cinchona officinalis* (3X HPUS), *Ipecacuanha* (3X HPUS), *Calcarea carbonica* (12X HPUS), and *Chamomilla* (3X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

73.     The ingredients used in Simple Diarrhea #4 provide no health benefits. Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule

---

[7] Defendants also advertise Simple Diarrhea #1 as a Cold & Flu Remedy.

derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

74.    Defendants know there are **no** or just **trace** amounts of active ingredients present in Simple Diarrhea #4 and therefore must be aware that Simple Diarrhea #1 cannot relieve any symptoms for which the Defendants advertise them.

75.    Simple Diarrhea #4 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Simple Diarrhea #4 is sold in 135 ct. boxes and the price is approximately $6.49 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

76.    Absent the misstatements described herein, consumers would not have purchased Simple Diarrhea #4.

77.    Plaintiff seeks justice for herself and similarly-situated consumers of Simple Diarrhea #4 by means of this action to enjoin the ongoing deceptive practices described herein.

H.   Bedwetting Pellets #30

78.    Defendants advertise that Bedwetting Pellets #30 "temporarily relieves the symptoms of bladder irritation and incontinence in children."  It purports to "100% All Natural" and "the gentle, all natural remedy for bedwetting. *See* Exs. 1-2.

79.    In purchasing Bedwetting Pellets #30, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is "Fast Acting," "100% All Natural," "contains no animal ingredients" and provides "Relief for Children's Incontinence," among other representations.  *See* Ex. 2, Misrepresentation Chart.

80.     The purportedly active ingredients of Bedwetting Pellets #30 include *Cantharis* (6X HPUS), *Mercurius Corrosivus* (6X HPUS), *Causticum* (3X HPUS), and *Equisetum hyemale* (3X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

81.     The ingredients used in Bedwetting Pellets #30 provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.  Further, even if the Product did contain more than trace amounts of active ingredients, Bedwetting Pellets contain Cantharis (a beetle), which contradicts the "no animal ingredients" claim.  The "no animal ingredients" claim is therefore false and misleading to consumers.

82.     Defendants know there are **no** or just **trace** amounts of active ingredients present in Bedwetting Pellets #30 and therefore must be aware that Bedwetting Pellets #30 cannot relieve any symptoms for which the Defendants advertise them.

83.     Bedwetting Pellets #30 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Bedwetting Pellets #30 is sold in 135 ct. boxes and the price is approximately $6.29 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

84.     Absent the misstatements described herein, consumers would not have purchased Bedwetting Pellets #30.

85.     Plaintiff seeks justice for herself and similarly-situated consumers of Bedwetting Pellets #30 by means of this action to enjoin the ongoing deceptive practices described herein.

I.     Cherry Colic Pellets #36

86.     Defendants advertise that Cherry Colic Pellets #36 as using "natural ingredients to gently relieve occasional discomfort and wakefulness."  It purports to "relieve the symptoms referred to as gas, including bloating and pressure, and helps to reduce difficulty falling asleep." *See* Exs. 1-2.

87.      In purchasing Cherry Colic Pellets #36, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is  "Fast Acting," "100% All Natural," "Children's Gas & Discomfort Relief," among other representations.  *See* Ex. 2, Misrepresentation Chart.

88.     The purportedly active ingredients of Cherry Colic Pellets #36 include *Carbo vegetabilis* (12X HPUS), *Chamomilla* (1X HPUS), and *Avena Sativa* (1X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

89.     The ingredients used in Cherry Colic Pellets #36 provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule

18

1
2

derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

3
4
5
6

90.     Defendants know there are **no** or just **trace** amounts of active ingredients present in Cherry Colic Pellets #36 and therefore must be aware that Cherry Colic Pellets #36 cannot relieve any symptoms for which the Defendants advertise them.

7
8
9
10
11
12

91.     Cherry Colic Pellets #36 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Cherry Colic Pellets #36 is sold in 135 ct. boxes and the price is approximately $6.49 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

13
14

92.     Absent the misstatements described herein, consumers would not have purchased Cherry Colic Pellets #36.

15
16
17

93.     Plaintiff seeks justice for herself and similarly-situated consumers of Cherry Colic Pellets #36 by means of this action to enjoin the ongoing deceptive practices described herein.

18

**COLD & FLU REMEDIES**

19
20

94.     Defendants manufacture, advertise, distribute and sell a variety of Cold & Flu Remedies, including Simple Fever #1, Simple Diarrhea #4, Cough Control #7, Cold Relief #77.

21
22
23

95.     Defendants advertise their Cold & Flu Remedies as "100% All Natural," "Non-Drowsy Relief" for the "common cold."

24

J.     Simple Fever #1

25
26

96.     Defendants advertise Simple Fever #1 as both a Children's Remedy and a Cold & Flu Remedy, as discussed *supra* Section F.

27

K.     Simple Diarrhea #4

28

19

97.     Defendants advertise Simple Diarrhea #1 as both a Children's Remedy and a Cold & Flu Remedy, as discussed *supra* Section G.

L.   Cough Control # 7

98.     Defendants advertise that Cough Control #7 as "specifically formulated to provide effective, long lasting relief for the whole family" and "temporarily relieves cough due to minor bronchial irritation associated with the common cold." *See* Exs. 1-2.

99.     In purchasing Cough Control #7, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is a "Fast Acting," "All Natural Cough Supressant" among other representations. *See* Ex. 2, Misrepresentation Chart.

100.     The purportedly active ingredients of Cough Control #7 include *Belladonna* (3X HPUS), *Phosphorus* (6X HPUS), *Spongia tosta* (2X HPUS), and *Byonia alba* (3X HPUS). However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses. Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products. *See* Ex. 3, Dilution Chart.

101.     The ingredients used in Cough Control #7 provide no health benefits. Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

102.    Defendants know there are **no** or just **trace** amounts of active ingredients present in Cough Control #7 and therefore must be aware that Cough Control #7 cannot relieve any symptoms for which the Defendants advertise them.

103.    Cough Control #7 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Cough Control #7 is sold in 135 ct. boxes and the price is approximately $6.99 per 135-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

104.    Absent the misstatements described herein, consumers would not have purchased Cough Control #7.

105.    Plaintiff seeks justice for herself and similarly-situated consumers of Cough Control #7 by means of this action to enjoin the ongoing deceptive practices described herein.

M.  Cold Relief #77

106.    Defendants advertise that Cold Relief #77 as using "natural ingredients that work with the body to alleviate symptoms of the common cold."  It purports to provide "temporary relief of symptoms of the common cold, such as fever, chills, sneezing, runny nose & coughing, as well as red, itchy & watery eyes." *See* Exs. 1-2.

107.     In purchasing Cold Relief #77, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it "Treats Sneezing, Runny Nose, Coughing & Fever," and is an "All Natural Multi-Symptom Relief," among other representations.  *See* Ex. 2, Misrepresentation Chart.

108.    The purportedly active ingredients of Cold Relief #77 include *Arsenicum album* (6X HPUS), *Gelsemium sempervirens* (3X HPUS), *Alliu, cepa* (3X HPUS), and *Aconitum*

*napellus* (3C HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

109.    The ingredients used in Cold Relief #77 provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

110.    Defendants know there are **no** or just **trace** amounts of active ingredients present in Cold Relief #77 and therefore must be aware that Cold Relief #77 cannot relieve any symptoms for which the Defendants advertise them.

111.    Cold Relief #77 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Cold Relief #77 is sold in 32 ct. boxes and the price is approximately $8.99 per 32-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

112.    Absent the misstatements described herein, consumers would not have purchased Cold Relief #77.

113.    Plaintiff seeks justice for herself and similarly-situated consumers of Cold Relief #77 by means of this action to enjoin the ongoing deceptive practices described herein.

*Nigh v. Humphreys Pharmacal, Inc., et al.*
CLASS ACTION COMPLAINT

**PAIN RELIEF REMEDIES**

114.    Defendants manufacture, advertise, distribute and sell a variety of Pain Relief Remedies, including Symptoms of Delayed Menses #11, Arthritis Relief #15 and Insomnia Relief #40.[8]

115.    Defendants advertise their Pain Relief Remedies as "100% All Natural" remedies for "symptoms associated with delayed menses," "minor joint pain," and "occasional sleeplessness."

N.  Symptoms of Delayed Menses #11

116.    Defendants advertise that Symptoms of Delayed Menses #11 as using "natural ingredients to gently stimulate your body to return to its natural state of health." It purports to "temporary relieve[] symptoms associated with delayed menses, such as cramps, backache, anxiety, mood changes, nervous tension, irritability, headache & bloating." *See* Exs. 1-2.

117.    In purchasing Symptoms of Delayed Menses #11, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it is a "Natural Menstrual Symptom Remedy," "100% All Natural," "No Animal Ingredients," among other representations. *See* Ex. 2, Misrepresentation Chart.

118.    The purportedly active ingredients of Symptoms of Delayed Menses #11 include *Cimicifuga racemosa* (3X HPUS), *Pulsatilla* (3X HPUS), and *Sepia* (3X HPUS). However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses. Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly

---

[8] Defendants in the past have also manufactured, advertised, distributed and sold Simple Nervous Conditions #28.

spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

119.    The ingredients used in Symptoms of Delayed Menses #11 provide no health benefits.  Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.  Even if the Product did contain more than trace amounts of active ingredients, Symptoms of Delayed Menses contains Sepia (from cuttlefish), an animal product, which contradicts the "No Animal Ingredients" claim.  The "No Animal Ingredients" claim is therefore false and misleading to consumers.

120.    Defendants know there are **no** or just **trace** amounts of active ingredients present in Symptoms of Delayed Menses #11 and therefore must be aware that Symptoms of Delayed Menses #11 cannot relieve any symptoms for which the Defendants advertise them.

121.    Symptoms of Delayed Menses #11 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Symptoms of Delayed Menses #11 is sold in 32 ct. boxes and the price is approximately $15.55 per 32-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

122.    Absent the misstatements described herein, consumers would not have purchased Symptoms of Delayed Menses #11.

123.    Plaintiff seeks justice for herself and similarly-situated consumers of Symptoms of Delayed Menses #11 by means of this action to enjoin the ongoing deceptive practices described herein.

O.  Arthritis Relief #15

124.   Defendants advertise that Arthritis Relief #15 as a "natural formula to relieve minor joint pain."  It purports to "temporarily relieve[] minor aches & pains associated with arthritis and rheumatism." *See* Exs. 1-2.

125.    In purchasing Arthritis Relief #15, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it a "Fast Acting," "Natural Remedy for Minor Joint Pain" and is "100% All Natural," among other representations.  *See* Ex. 2, Misrepresentation Chart.

126.   The purportedly active ingredients of Arthritis Relief #15 include *Rhus toxicodendron* (6X HPUS), *Colchicum autumnale* (3X HPUS), *Causticum* (3X HPUS), and *Bryonia alba* (3X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

127.   The ingredients used in Arthritis Relief #15 provide no health benefits. Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

128.   Defendants know there are **no** or just **trace** amounts of active ingredients present in Arthritis Relief #15 and therefore must be aware that Arthritis Relief #15 cannot relieve any symptoms for which the Defendants advertise them.

129.    Arthritis Relief #15 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Arthritis Relief #15 is sold in 32 ct. boxes and the price is approximately $6.99 per 32-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

130.    Absent the misstatements described herein, consumers would not have purchased Arthritis Relief #15.

131.    Plaintiff seeks justice for herself and similarly-situated consumers of Arthritis Relief #15 by means of this action to enjoin the ongoing deceptive practices described herein.

    P.  Insomnia Relief #40

132.    Defendants advertise that Insomnia Relief #40 as a "natural sleep-aid [that] uses gentle, time-honored ingredient that work with your body to help relive occasional sleeplessness & restlessness."  It purports to "temporarily reduce[] difficulty falling asleep." *See* Exs. 1-2.

133.    In purchasing Insomnia Relief #40, consumers rely upon various representations Defendants make on the Product's packaging label, such as the Product's name itself, that it a "Nighttime Relief," and is "100% All Natural," among other representations.  *See* Ex. 2, Misrepresentation Chart.

134.    The purportedly active ingredients of Insomnia Relief #40 include *Chamomilla* (3X HPUS), *Coffea cruda* (3X HPUS), and *Hyoscyamus niger* (3X HPUS).  However, the active ingredients, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent in the Product such that the Product is ineffective for its intended uses.  Consumers, trusting the Defendants' assertions that the Product relieves fevers are unwittingly spending hundreds of thousands of dollars each year on worthless products.  *See* Ex. 3, Dilution Chart.

135.    The ingredients used in Insomnia Relief #40 provide no health benefits. Moreover, at the stupendously high dilutions used to prepare the product, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the Product sold to consumers.

136.    Defendants know there are **no** or just **trace** amounts of active ingredients present in Insomnia Relief #40 and therefore must be aware that Insomnia Relief #40 cannot relieve any symptoms for which the Defendants advertise them.

137.    Insomnia Relief #40 is nothing more than a placebo, with zero or a trace of the claimed active ingredients.  Insomnia Relief #40 is sold in 32 ct. boxes and the price is approximately $6.99 per 32-pellet package.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

138.    Absent the misstatements described herein, consumers would not have purchased Insomnia Relief #40.

139.    Plaintiff seeks justice for herself and similarly-situated consumers of Insomnia Relief #40 by means of this action to enjoin the ongoing deceptive practices described herein.

**OTHER PRODUCTS LABELED HOMEOPATHIC**

140.    Defendants manufacture and advertise other products bearing a "homeopathic" designation on their labels.

141.     In purchasing those homeopathic products, consumers rely upon various representations Defendants make on those products' packaging label, including that the products contain active ingredients.

27

142.     The purportedly active ingredients in those products, however, even if they were otherwise effective, are so greatly diluted as to be effectively non-existent, such that these products are ineffective for their intended uses.  Consumers, trusting the Defendants' assertions that the products relieve various symptoms are unwittingly spending hundreds of thousands of dollars each year on worthless products.

143.     The ingredients used in these products provide no health benefits:  At the stupendously high dilutions used to prepare them, they can have no effect of any kind in humans because the odds are astronomically high that even a single molecule derived from the original "extract" of the "active ingredients" could be present in the homeopathic products sold to consumers.

144.     Defendants know there are **no** or just **trace** amounts of active ingredients present in their products bearing a "homeopathic" designation on their labels and therefore must be aware that the products cannot relieve any symptoms for which the Defendants advertise them.

145.     Defendants' products bearing a "homeopathic" designation on their labels are nothing more than placebos, with zero or trace amounts of the claimed active ingredients.  These products sell for the same approximate retail price as the other products manufactured by Defendants alleged herein.  Hence, Defendants' unfair and deceptive practices have enriched them by hundreds of thousands of dollars, at the expense of thousands of Americans.

146.     Absent the misrepresentations described herein, consumers would not have purchased Defendants' products labeled "homeopathic."

147.     Plaintiff seeks justice for herself and similarly-situated consumers by means of this action to enjoin the ongoing deceptive practices described herein.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### SPECIFIC MISREPRESENTATIONS,

### MATERIAL OMISSIONS, AND DECEPTIVE FACTS

#### (As to All Causes of Action Against All Defendants)

148.   Defendants' advertising of their Products is and has been the subject of an extensive and comprehensive, nationwide marketing campaign in various media including the internet.

149.   Defendants primarily advertise and promote their Products through labeling claims on the front of the Products' package.  Among other things, each Products' name clearly states what ailments and symptoms the particular product is designated for.  For example, Baby Teething Relief provides a clear representation to consumers that it is designed to alleviate the symptoms identified in the name.  *See* Exs. 1-2.  Label descriptions on the Products' packaging, taken as a whole, further clarify what each of the Products is supposed to do.  *See* Misrepresentation Chart, attached hereto as Ex. 2 for the challenged statements regarding all Products.  Plaintiff and members of the Class relied on the Products' names and label statements in purchasing Defendants Products.

150.   Defendants manufacture, distribute, advertise and sell their homeopathic Products as containing "active" ingredients.   However, Defendants' Products are essentially placebos.  Even if Defendants' Products contain the purportedly active ingredients, as listed on Defendants' Products' labels, those ingredients are ineffective and/or so greatly diluted as to be non-existence in the Products, such that the Products are ineffective for their intended uses. *See* Exs. 1-3.

151.   Defendants also promote their Products' claims through their labels; that the products are "100% All Natural," among other representations.  *See* Ex. 2, Misrepresentation Chart.

152.    Defendants also use their websites, http://humphreysusa.com/index.html and www.humphreysbaby.com to advertise and promote their homeopathic Products.

153.    Defendants advertise their Products as effective in relieving various symptoms. *See* Ex. 2, Misrepresentation Chart.

154.    Defendants represent that "[Humphrey's] products are based on traditional, time-honored ingredients, updated to reflect the latest developments in health;" however, Defendants do not explain to consumers the nature of homeopathic medicine or the method of measurement used for its products. For example, Defendants fail to state what the dilution levels of X, C, K and similar dilution levels mean, in a language understandable to an average consumer.  *See* 21 C.F.R. § 201.10(d)(i).  In fact, because of the dilutions of these purported "time-honored ingredients," Defendants' Products are nothing more than a placebo.

155.    Defendants' labeling and advertising claims are false and deceptive because Defendant's Products are composed of nothing more than corn starch, natural flavoring, and sucrose (sugar) onto which minute quantities of water have been absorbed.  The Products thus contain no active ingredients, and have no effect on ailments and symptoms they are advertised for, and in fact did not alleviate the ailments or symptoms for which Plaintiff purchased them.

156.    Defendants' labeling and advertising claims are further false and deceptive because there is no credible scientific evidence that Defendants' Products have any effect on various symptoms and ailments they purport to relieve and Defendants are free to indicate uses without any regulatory oversight, a fact that is not disclosed to consumers.

# CLASS ACTION ALLEGATIONS

**A.**    **The Nationwide Consumer Class**

157.    Pursuant to Rules 23(a), (b)(3) and/or (b)(2) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and a nationwide consumer class ("Nationwide Class") initially defined as follows:

- Nationwide Class for the Plaintiff and the Class' breach of express warranty, breach of implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, Consumer Legal Remedies Act (CLRA, Cal. Civ. Code § 1750, *et seq.*), Unfair Competition Law (UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*), False Advertising Law (FAL, Cal. Bus. & Prof. Code § 17500, et seq.), and unjust enrichment claims: All purchasers of Humphreys Pharmacal, Inc.'s and Dickinson Brands, Inc.'s products labeled "homeopathic", including, but not limited to, Original Teething Pellets #3, Cherry Teething Pellets #3, Berry Teething Pellets #3, Simple Fever #1, Simple Diarrhea #4, Bedwetting Pellets #30, Cherry Colic Pellets #36, Cough Control #7, Cold Relief #77, Symptoms of Delayed Menses, Arthritis Relief #15, Insomnia Relief #40, and Simple Nervous Conditions #28, and all iterations/variations of the aforementioned products, for personal or household use and not for resale, in the United States from period June 20, 2008 to the present (the "Class Period"). Excluded from the nationwide consumer class are governmental entities, the Defendants, any entity in which the Defendants have a controlling interest, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, class counsel and

31

their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

158.    The proposed Class is so numerous that individual joinder of all its members is impracticable.  Due to the nature of the trade and commerce involved, however, Plaintiff believes the total number of Class members is at least in the thousands and members of the Class are numerous and geographically dispersed across the United States.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.  The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

159.    Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief and damages as to their Products appropriate with respect to the Class as a whole.  In particular, Defendants have failed to disclose the true nature of the Products being marketed and that the Products are nothing more than sugar pill.

160.    There is a well-defined community of interest in the questions of law and fact involved affecting the Plaintiff and the Class and these common questions of fact and law include, but are not limited to, the following:

a.    Whether the claims discussed above are true, misleading, or reasonably likely to deceive;

b.    Whether Defendants' alleged conduct violates public policy;

c.    Whether the alleged conduct constitutes violations of the laws asserted herein;

d.    Whether Defendants engaged in false or misleading advertising;

*Nigh v. Humphreys Pharmacal, Inc., et al.*
CLASS ACTION COMPLAINT

e.      Whether the Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

f.      Whether the Plaintiff and Class members are entitled to declaratory and injunctive relief.

161.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have been similarly affected by the Defendant's common course of conduct since they all relied on Defendants representations concerning their homeopathic Products and purchased the Products based on those representations.

162.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in handling complex class action litigation in general and scientific claims, including for homeopathic drugs, in particular. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

163.    Plaintiff and the members of the Class suffered and will continue to suffer harm as a result of the Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impracticable.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and efficient handling of all Class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the

33

parties and of the judicial system and protects the rights of the class members.  Furthermore, for many, if not most, a class action is the only feasible mechanism that allows an opportunity for legal redress and justice.

164.    Adjudication of individual Class members' claims with respect to the Defendants would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other class members to protect their interests.

## FIRST CAUSE OF ACTION

**VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT**

*California Civil Code §§ 1750, et seq.*

**(On Behalf of Plaintiff and the Class, as Against Defendants)**

165.    Plaintiff repeats, realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

166.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "Act").  Plaintiff and the members of the Class are consumers as defined by California Civil Code § 1761(d).  The Products are goods within the meaning of the Act.

167.    Defendants violated and continue to violate the Act by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of the Products:

- Representing that [the Products have]…characteristics, ingredients, uses, benefits or quantities which [the Products] do not have. (Civ. Code, § 1770, subd. (a) (5).)

34

- Representing that [the Products] are of a particular standard, quality or grade… if they are of another.  (Civ. Code, § 1770, subd. (a) (7).)

- Advertising [Products] …with intent not to sell them as advertised.  (Civ. Code, § 1770, subd. (a) (9).)

- Representing that [the Products] have been supplied in accordance with a previous representation when it has not.  (Civ. Code, § 1770, subd. (a) (16).)

168.   Defendants violated the Act by representing through advertising of the Products as described above, when they knew, or should have known, that the representations and advertisements were false or misleading.

169.   Plaintiff and members of the Class reasonably relied upon the Defendants' representations as to the quality and attributes of the Products.

170.   Plaintiff and other members of the Class were deceived by Defendants' representations about the quality and attributes of the Products, including but not limited to the purported benefits of the Products, taken as a whole, that their Products provide, *inter alia*, Defendants advertise their Products are effective in relieving various symptoms and ailments. *See* Exs. 1-2, for other false claims.  Plaintiff and other Class members would not have purchased the Products had they known the Defendants' claims were untrue, and had they known the true nature of the Products.

171.   Pursuant to section 1782 *et seq*. of the Act, Plaintiff notified the Defendants in writing by certified mail of the particular violations of § 1770 of the Act as to their Products and demanded the Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.  Defendants' wrongful business practices regarding the Products constituted, and constitute, a continuing course of conduct in

violation of the California's Consumers Legal Remedies Act since Defendants are still representing that the Products have characteristics, uses, benefits, and abilities which are false and misleading, and have injured Plaintiff and the Class.  A copy of Plaintiff Nigh's letter is attached as **Exhibit 4** hereto.

172.    Pursuant to California Civil Code § 1780(a), Plaintiff and the Class seek an order of this Court enjoining the Defendants from continuing to engage in unlawful, unfair, or deceptive business practices and any other act prohibited by law.

173.    Pursuant to California Civil Code § 1782(d), Plaintiff and the Class seek a Court order enjoining the above-described wrongful acts and practices of the Defendants with respect to their Products.

## SECOND CAUSE OF ACTION

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

*California Business and Professions Code §§ 17200, et seq.*

**(On Behalf of Plaintiff and the Class, as Against Defendants)**

174.    Plaintiff repeats, realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

175.    California's Unfair Competition Law, Business and Professions Code § 17200 (the "UCL") prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons discussed above, Defendants have engaged in unfair, deceptive, untrue and misleading advertising in violation of the UCL.

176.    The UCL also prohibits any "unlawful… business act or practice."  Defendants violated the UCL's prohibition against engaging in unlawful acts and practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and by

36

violating among others, California Civil Code §§ 1572, 1573, 1709, 1710, 1711, 1770, California Health and Safety Code §§ 109875, *et seq.*, Cal. Bus. & Prof. Code §§ 12601, *et seq.* ("Fair Packaging and Labeling Act"), California Commercial Code § 2313(1), and the common law. Such conduct is ongoing and continues to this date. *See* Exs. 2-3.

177.    Plaintiff and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

178.    California Business and Professions Code § 17200 also prohibits any "unfair"… business act or practice."

179.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. Such conduct is ongoing and continues to this date.

180.    Plaintiff alleges violations of consumer protection, unfair competition and truth in advertising laws in California and other states resulting in harm to consumers. Plaintiff asserts violation of the public policy of engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of the UCL. Such conduct is ongoing and continues to this date.

181.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

182.    The UCL also prohibits any "fraudulent business act or practice."

37

183.    Defendants' claims, nondisclosures (i.e., omissions), and misleading statements, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of the UCL.  Such conduct is ongoing and continues to this date.

184.    Defendants' conduct caused and continues to cause substantial injury to Plaintiff and the other members of the Class.  Plaintiff has suffered injury in fact as a result of Defendants' unfair conduct.

185.    Defendants have thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling Plaintiff to injunctive relief against Defendants, as set forth in the Prayer for Relief.

186.    Pursuant to Business and Professions Code § 17203, Plaintiff seeks an order requiring Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices and requiring Defendants to engage in a corrective advertising campaign.

187.    Plaintiff also seeks an order for the disgorgement and restitution of all monies from the sale of Defendants' Products, which were unjustly acquired through acts of unlawful, unfair, and/or fraudulent competition.

### THIRD CAUSE OF ACTION

**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**

***California Business and Professions Code §§ 17500, et seq.***

**(On Behalf of Plaintiff and the Class, as Against Defendants)**

188.    Plaintiff repeats, realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

189.    Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact as a result of Defendants' actions as set forth herein.  Specifically, prior to the filing of this action,

38

Plaintiff purchased the Products in reliance upon Defendants' marketing claims.  Plaintiff used the Products as directed, but the Products did not worked as advertised, nor provided any of the promised benefits.

190.    Defendants' business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to California Business and Professions Code §§ 17500, *et seq.* because Defendants have advertised their Products in a manner that is untrue or misleading, or that is known to Defendants to be untrue or misleading.

191.    Defendants' wrongful business practices have caused injury to Plaintiff Nigh and the Class.

192.    Pursuant to section 17535 of the California Business and Professions Code, Plaintiff and the Class seek an order of this court enjoining the Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in the complaint.

193.    Plaintiff also seeks an order for the disgorgement and restitution of all monies from the sale of Defendants' Products, which were unjustly acquired through acts of unlawful, unfair, deceptive and/or fraudulent competition.

## FOURTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

**(On Behalf of Plaintiff and all Class Members, as Against Defendants)**

194.    Plaintiff repeats, realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

195.    On the Products' labels and through their marketing campaign as described above, Defendants made affirmations of fact or promises, or description of goods, which formed "part of the basis of the bargain" at the time of purchase.  *See* Ex. 2, Misrepresentation Chart.

196.    The warranties were breached because the Products did not live up to their warranties, and that breach caused injury in the form of the lost purchase price for the Products. *See* Cal. Com. Code § 2313(1); *see also Zwart v. Hewlett-Packard Co.*, 2011 WL 3740805 (N.D. Cal., Aug. 23, 2011) (holding that online assertions can create warranties).

197.    As a result of Defendants' breach of their warranties, Plaintiff and the Class have been damaged in the amount of the purchase price of the Products they purchased.

<u>**FIFTH CAUSE OF ACTION**</u>

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(On Behalf of Plaintiff and the Class, as Against Defendants)**

198.    Plaintiff repeats, realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

199.    Defendants, through their acts and omissions as set forth herein, in their sale, marketing and promotion of their Products, made representations to Plaintiff and the members of the Class that their Products provide the claimed health benefits, among other representations. *See* Ex. 2, Misrepresentation Chart.

200.    Plaintiff and the Class bought the Products manufactured, advertised and sold by Defendants.

201.    Defendants are merchants with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was in the sale to Plaintiff and other members of the Class an implied warranty that those goods were merchantable.

40

202. However, Defendants breached that warranty implied in the sale of goods in that their Products do not provide the purported claimed health benefits, as set forth in detail herein.

203. As a result of Defendants' conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Defendants to be merchantable in that they did not conform to the promises and affirmations made on the container or label of the goods.

204. Plaintiff Nigh and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT,

### 15 U.S.C. §§ 2301, *et. seq*.;

### (On Behalf of Plaintiff and the Class, as Against Defendants)

205. Plaintiff repeats, realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

206. Plaintiff brings this claim individually and on behalf of the members of the Class.

207. Defendants' Products are consumer products as defined in 15 U.S.C. § 2301(1).

208. Plaintiff and the other Class members are consumers as defined in 15 U.S.C. § 2301(3).

209. Defendants are the suppliers and warrantors as defined in 15 U.S.C. §§ 2301(4) and (5).

210. In connection with the sale of the Products, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the Products offer relief from various ailments and symptoms as listed in Ex. 2, when in fact, these Products do not provide relief for any of these ailments or symptoms.

41

211.     By breaching the express written warranties stating that the Products relieve ailments and symptoms as listed in Ex. 2, Defendants violated the statutory rights of Plaintiff Nigh and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq., thereby damaging Plaintiff Nigh and other Class members.

212.     Plaintiff notified the Defendants in writing of their claims and that the Plaintiff is acting on behalf of the Classes.  *See* Ex. 4.

**SEVENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(On Behalf of Plaintiff and the Class, as Against Defendants)**

213.     Plaintiff repeats, realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

214.     As a result of Defendants' false and deceptive advertising, unfair, deceptive, untrue or misleading business practices and misrepresentations and in consideration thereof, during the relevant time period set forth above, the Class members paid money to and conferred a benefit upon Defendants in connection with Defendants' Products sold to Class members, which monies were originally in the Class members' possession.

215.     Defendants received, retained or appropriated these benefits under such circumstances that it would be inequitable and unjust to permit Defendants to retain such monies at the expense of the Class members.  Defendants, as a result of such conduct, became indebted to the Class members for the sums paid to Defendants by Class members as set forth in detail above, with interest thereon.  No such sums have been paid to the Class members.

216.     In fairness, all such monies, including all interest Defendants have earned on such monies while in wrongful possession thereof, should be disgorged by Defendants and paid to

members of the Class under principles of unjust enrichment. No violation of law or public policy would be promoted by such relief.

217.    As a direct and proximate result of Defendants' conduct resulting in their unjust enrichment, Plaintiff and Class members suffered injury, and therefore seek an order directing Defendants to return the amount each of them were improperly induced to pay to Defendants, plus interest thereon, as well as impose a constructive trust over such monies.

## **PRAYER FOR RELIEF**

218.    Wherefore, Plaintiff Nigh, on behalf of herself, all others similarly situated and the general public, pray for judgment against the Defendants as to each and every cause of action, including:

A.    An order declaring this action to be a proper Class Action and requiring Defendants to bear the costs of Class notice;

B.    An order awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

C.    An order awarding restitution and disgorgement of Defendants' revenues from the Products to Plaintiff Nigh and the proposed Class members.

D.    An order compelling Defendants to engage in a corrective advertising campaign to inform the public concerning the true nature of their Products;

E.    An order awarding attorneys' fees and costs to Plaintiff Nigh and the Class;

F.    An order providing for all other such equitable relief as may be just and proper.

*Nigh v. Humphreys Pharmacal, Inc., et al.*
CLASS ACTION COMPLAINT

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 7, 2012

                                        /s/ Ronald A. Marron
                                        Ronald A. Marron
                                        *ron@consumersadvocates.com*
                                        **LAW OFFICES OF RONALD A.**
                                        **MARRON, APLC**
                                        SKYE RESENDES
                                        3636 4th Avenue, Suite 202
                                        San Diego, California 92103
                                        Telephone: (619) 696-9006
                                        Facsimile: (619) 564-6665

                                        ***Attorneys for Plaintiff and the Proposed Class***

44